UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| GAP ENGINEERING, INC., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:05-cv-0041-RLY-WGH |
| | ) | |
| ALCOA, INC., | ) | |
|     Defendant. | ) | |

**ENTRY ON PLAINTIFF, GAP ENGINEERING, INC.'S, MOTION FOR PARTIAL SUMMARY JUDGMENT**

Before the court is Plaintiff, GAP Engineering, Inc.'s ("GAP"), Motion for Partial Summary Judgment on Count I of its Complaint. Through this motion, GAP seeks a declaration that it is the exclusive owner of what is now known as the Pressurized Fluid Application System ("PfAS technology.") For the reasons set forth below, the court **GRANTS** GAP's motion.

**I.    Facts**

1. On February 22, 1996, Aloca, Inc. and GAP entered into a contract establishing the rights and obligations between the parties for GAP's provision of certain goods and services to Alcoa, including design, engineering, and consulting services. The contract was entitled Contract No. 50040, also known as the "1996 Agreement." (*See* Pankake Dep. Ex. 9).

2. The 1996 Agreement provides that:

1

> [GAP] shall promptly disclose to Alcoa all data, drawings, designs, information, discoveries, inventions and improvements, whether or not patentable or copyrightable, including any and all expressions of computer programs, manuals, data bases and all forms of computer hardware, firmware and software, conceived, made, first reduced to practice, or made or developed by [GAP] arising out of the providing of Goods and/or Services (hereinafter referred to as "Contract Developments"). All Contract Developments shall be the sole and exclusive property of Alcoa in respect to any and all countries, their territories, and possessions.

(*See* Pankake Dep. Ex. 9, Section 9(a)).

3. In August of 1996, Eugene Pankake, the owner and president of GAP, began working on the PfAS technology. (Deposition of Eugene Pankake ("Pankake Dep.") at 51-53). The PfAS technology is used on one of the coating lines in the rigid packaging division, specifically a line used to manufacture Rigid Container Sheets for use in beverage and food containers. (Deposition of Guy Wilson ("Wilson Dep.") at 39, 52).

4. Alcoa took an interest in this technology and ordered prototypes which would later be installed on a roll coating line at Alcoa. (Deposition of Jim Schade ("Schade Dep.") at 40).

5. By April of 1999, GAP filed its provisional patent applications and GAP was close to filing its final patent application. (Plaintiff's Ex. 4).

6. During this time frame, GAP and Alcoa discussed amending the 1996 Agreement and its terms. (Wilson Dep. at 62-63). Numerous drafts of an addendum were circulated by the parties. (Pankake Dep. Exs. 11, 12, 13, and 16).

7. In January of 2000, the parties decided to enter into a new agreement instead of simply amending the 1996 Agreement. (Wilson Dep. at 62-63).

8. During the negotiation process, GAP gave written notification to Alcoa that it intended to terminate the 1996 Agreement. (Pankake Dep. Ex. 18).

9. The new contract, Contract 50040a (the "2000 Contract"), contains several recitals. (Pankake Dep. Ex. 10).

10. The first recital specifically addresses the 1996 Agreement:

> Whereas, Alcoa and GAP both desire to render null and void and supercede any and all former agreements between both parties, including but not limited to Contract 50040 [the 1996 Agreement] entered into on February 22, 1996 . . .

(Pankake Dep. Ex. 10).

11. The sixth recital specifically addresses the PfAS technology and its ownership. It reads:

> Whereas, GAP is the exclusive owner and enjoys all rights, title and ownership of its wet film application system and any derivative intellectual property arising therefrom as defined by GAP's patent applications and technology development documentation. "PfAS Technology" is defined as equipment used to apply air free coating directly to an application roll for the purpose of coating a moving web;

(Pankake Dep. Ex. 10).

13. Section 1 of the 2000 Agreement's operative terms reiterates the recitals and states:

> Alcoa acknowledges GAP's exclusive ownership of its wet film application system including PfAS Technology and

>  any derivative intellectual property arising therefrom as defined by GAP's patent application and/or technology development documentation and agrees not to interfere or infringe on such proprietary rights either directly or indirectly such that GAP enjoys all rights, title and interest as aforementioned.

(Pankake Dep. Ex. 10, Section 1).

14. Section 1 also details Alcoa's rights to PfAS. (Pankake Dep. Ex. 10). Those rights include:

>  (1) Section 1.01  Alcoa has the right to pursue patent infringement as an agent and on behalf of GAP;
>
>  (2) Section 1.02  Alcoa has the right to maintain exclusive approval rights to any marketing and/or sale of the PfAS technology in the rigid container sheet markets for beer, beverage, tab and food containers;
>
>  (3) Section 1.03  Alcoa has the right to have installed the PfAS technology "When and Where Alcoa sees fit";
>
>  (4) Section 1.04  Alcoa has the right to purchase GAP equipment;
>
>  (5) Section 1.09  Alcoa shall have first right of refusal for the purchase of GAP and/or PfAS Technology in the event GAP and/or PfAS Technology are/is offered for sale.

(Pankake Dep. Ex. 10, Section 1.01-1.04, 1.09).

15. Section 4.02 provided that any party could terminate the 2000 Agreement at any time upon ninety (90) days written notice. (Pankake Dep. Ex. 10, Section 4.02).

16. In October of 2001, GAP offered to sell the PfAS technology patents to Alcoa. (Deposition of Michael Rautenbach ("Rautenbach Dep.") Exs. 25, 26).

4

17. Alcoa considered its rights under the 2000 Agreement, and concluded that purchasing the technology was unnecessary. (Rautenback Dep. at 52-55; Rautenbach Dep. Exs. 27, 31).

18. On November 17, 2003, GAP sent a letter to Mike Rautenbach, Alcoa's Director of Procurement, to terminate the 2000 Agreement. (Rautenback Dep. Ex. 30).

19. The letter returned unopened. (Rautenbach Dep. at 66; Pankake Dep. at 213).

20. On December 2, 2003, Pankake was issued Patent No. 6,656,529 for the PfAS technology. (Complaint, ¶ 16).

20. On December 10, 2003, Pankake sent a letter to Randy Gibson and Wendy Winge of Aloca, and reiterated that he was giving notice of cancellation of the 2000 Agreement. (Complaint, Ex. D; Pankake Dep. at 155).

21. In response, Alcoa's attorneys sent a letter in May of 2004 stating that Alcoa had an ownership interest in GAP's patent of PfAS technology. (Complaint, Ex. E).

**II.    Discussion**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992).

Generally, construction of a written contract is a question of law for which

summary judgment is particularly appropriate. *Slutsky-Peltz Plumbing & Heating Co., Inc. v. Vincennes Community School Corp.*, 556 N.E.2d 344, 346 (Ind.Ct.App. 1990). Summary judgment is appropriate when the language of a written contract is unambiguous. *Fetz v. Phillips*, 591 N.E.2d 644, 647 (Ind.Ct.App. 1992). In interpreting an unambiguous contract, the court must give effect to the intentions of the parties as expressed in the four corners of the instrument. *Hyperbaric Oxygen Therapy Systems, Inc. v. St. Joseph Medical Center of Ft. Wayne, Inc.*, 683 N.E.2d 243, 247 (Ind.Ct.App. 1997), *trans. denied*. Clear, plain, unambiguous terms are conclusive of that intent. *Id.* The court will neither construe clear and unambiguous provisions nor add provisions not agreed upon by the parties. *Id.*

The clear and unambiguous language of the 2000 Agreement provided that the 1996 Agreement was null and void upon its execution:

> Whereas, Alcoa and GAP both desire to render null and void and supercede any and all other former agreements between both parties, including, but not limited to [the 1996 Agreement] entered into on February 22, 1996. . .

(Pankake Dep. Ex. 10). Therefore, any rights to the PfAS technology Alcoa may have enjoyed by virtue of the 1996 Agreement are now a nullity.

Moreover, the 2000 Agreement specifically and unambiguously provides that GAP is the exclusive owner of the PfAS technology. The relevant provisions of the 2000 Agreement read:

> Whereas, GAP is the exclusive owner and enjoys all rights, title and ownership of its wet film application system and any

>derivative intellectual property arising therefrom as defined by GAP's patent applications and technology development documentation. "PfAS Technology" is defined as equipment used to apply air free coating directly to an application roll for the purpose of coating a moving web;

and,

>Alcoa acknowledges GAP's exclusive ownership of its wet film application system including PfAS Technology and any derivative intellectual property arising therefrom as defined by GAP's patent application and/or technology development documentation and agrees not to interfere or infringe on such proprietary rights either directly or indirectly such that GAPs enjoys all rights, title and interest as aforementioned.

(Pankake Dep. Ex. 10, Section 1).

That said, the 2000 Agreement did give Alcoa certain rights in the PfAS technology; however, it did not grant Alcoa all substantial rights to the technology. A transfer of rights is considered an assignment if the patentee surrenders all substantial rights to his technology. *J. Carl Cooper v. Toshiba America Consumer Products, Inc*., 1999 U.S. Dist. LEXIS 23341, 6-8 (N.D. Ohio, March 31, 1999). In determining whether all substantial rights have been transferred, the courts look to several factors which include: "(1) whether the grantor retained the right to make, use, and sell products embodying the patented inventions; (2) whether the grantor retained the right to bring suit against suspected infringers if the grantee refused to do so; and (3) whether the grantor retained the right to make additional proprietary grants." *Id.* In this case, GAP retained the right to pursue patent infringement actions. GAP retained control over the marketing

and sale of the PfAS technology in all industries other than the rigid container sheet markets for beer, beverage, tab and food containers. GAP held the patent for the technology, and GAP enjoyed all rights, title and ownership of the technology. Therefore, GAP maintained ownership of the PfAS technology and its patents. At the most, Alcoa was given rights to use GAP's technology as noted within the 2000 Agreement.

Termination of the 2000 Agreement did not affect GAP's ownership in the PfAS technology. GAP gave Alcoa written notification of its intent to terminate the 2000 Agreement pursuant to Section 4.02 of the Agreement. (Pankake Dep. Ex. 10, Section 4.02). That section provided that upon termination of the Agreement, neither party owed any continuing duty and/or obligation to the other with the exception of maintaining confidential information. (Pankake Dep. Ex. 10). Upon termination of the Agreement, Alcoa no longer had any rights to the PfAS technology. *See National Rejectors, Inc. v. A.B.T. Mfg. Corp.*, 184 F.2d 612, 616 (7th Cir. 1951) (where parties' licensing agreement provided for termination and those contractual conditions were met, court could properly sanction cancellation of license). The termination did not, however, change the fact that GAP owns the PfAS technology and is its patent holder. *Id.* Although Alcoa may not think this is fair, Alcoa had protection built into the contract; i.e., the right to purchase GAP and/or the PfAS technology patents. Prior to the Agreement's termination, Alcoa was given the opportunity to purchase GAP and/or the PfAS technology patents, and Alcoa declined that offer. If Alcoa had desired additional protection or intended for the

rights it was given under the 2000 Agreement to survive termination, Alcoa's senior management and/or in-house counsel could have provided for the same as it had provided protection for its confidential information post-termination. *Three D Departments, Inc. v. K Mart Corp.*, 1991 U.S. App. LEXIS 18958, *8 (N.D. Ill., August 9, 1991). As no such additional protections were provided, Alcoa's interests in the PfAS technology were terminable pursuant to the terms of the 2000 Contract. *National Rejectors, Inc.*, 184 F.2d at 616.

### III. Conclusion

For the reasons set forth above, the court finds GAP is the exclusive owner of the PfAS technology. Accordingly, the court **GRANTS** GAP Engineering, Inc.'s Motion for Partial Summary Judgment.

**SO ORDERED** this 24th day of August 2006.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Angela L. Freel
RUDOLPH FINE PORTER & JOHNSON LLP
alf@rfpj.com

Richard O. Hawley, Jr.
KIGHTLINGER & GRAY LLP
rhawley@k-glaw.com

Erin J. Higgins
LEBOEUF LAMB GREENE & MACRAE LLP
ehiggins@llgm.com

James D. Johnson
RUDOLPH FINE PORTER & JOHNSON
jdj@rfpj.com

Brent R. Weil
KIGHTLINGER & GRAY
bweil@k-glaw.com

Copy to:

David G. Hetzel
LeBoeuf, Lamb, Greene & MacRae, LLP
One Gateway Center
420 Fort Dequesne Boulevard
Suite 1600
Pittsburgh, PA 15222-1437